**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| **American Ordnance LLC,** <br> **Plaintiff,** <br> **v.** <br> **The United States,** <br> **Defendant.** | **No. 08-238C** <br> **(Judge Wheeler)** <br> **REDACTED VERSION** |

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTIVE RELIEF**

For its Complaint in the above-captioned matter, plaintiff American Ordnance LLC ("AO") states as follows:

**NATURE OF ACTION**

1. This is a pre-award bid protest challenging the actions of the Department of the Army (the "Army"), Headquarters Army Sustainment Command ("HQ ASC"), Rock Island Arsenal, Rock Island, Illinois (collectively the "Agency"). On February 23, 2008, the Agency issued formal Solicitations as Requests For Proposals ("RFP" or "Solicitation") No. W52P1J06-R-0201, RFP No. W52P1J07-R-0124, and Basic Ordering Agreement ("BOA") No. W52P1J07-G-0004. These documents solicited offers for the manufacture and supply of ammunition and other services to government and commercial customers in optimizing operation and maintenance of two government-owned contractor-operated facilities, specifically the Iowa Army Ammunition Plant, located in Middletown, Iowa ("IAAAP"), and the Milan Army

[redacted]

Ammunition Plant, located in Milan Tennessee ("MLAAP") (collectively referred to as the "Procurement").

2. The Agency's issuance of the Solicitations on February 23, 2008 was arbitrary, capricious and unreasonable given events that had transpired prior to the issuance of the Solicitations, specifically the Agency released AO proprietary cost and other information to AO's competitors; the Agency acknowledged that such release was improper and that some of AO's competitors had access to and did access AO's proprietary information; and the Army took no meaningful action to mitigate the taint to the integrity of the Procurement or harm to AO caused by the improper release of AO proprietary information.

3. The Agency's decision to proceed with the Procurement under these circumstances lacks a rational basis and violates the Competition in Contracting Act, 41 U.S.C. § 253 ("CICA"), and pertinent provisions of the Federal Acquisition Regulation, including FAR § 15.503(b)(v).

4. AO seeks a declaratory judgment that the Agency's actions are arbitrary, capricious and lack a rational basis and that the present Solicitations must be canceled until a sufficient time can pass to allow the taint to the Procurement and the harm to AO to pass. In this regard AO seeks to enjoin the Agency from awarding a contract under the present Solicitations.

**JURISDICTION AND VENUE**

5. This Court has original jurisdiction over pre-award protests pursuant to 28 U.S.C. § 1491(b)(1) and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1491.

**STANDING**

[redacted]



DSMDB-2443193v01

7. AO is an "interested party," and therefore has standing under 28 U.S.C. § 1491(b), because AO is the incumbent contractor and a "prospective offeror" under the Procurement, has an economic interest in the outcome of the Procurement, and suffered prejudice due to the Agency's improper actions.

**PARTIES**

8. AO is a limited liability company organized and existing under the laws of the State of Delaware. AO is a wholly-owned subsidiary of Day & Zimmermann, Inc. ("DZI"). AO began in 1998 as a joint venture of its predecessors-in-interest, Mason & Hanger Corporation ("MHC") and General Dynamics Ordnance Systems, Inc. ("GDOS"). DZI acquired MHC after the formation of AO, and DZI later acquired GDOS' interest in AO. (All references to "AO" include AO and its predecessor in interest MHC). AO is a manufacturer of ammunition. AO has manufactured and supplied ammunition to the government and commercial customers under a 1998 contract with the Army to operate and maintain the IAAAP and MLAAP. AO's 1998 contract with the Army is due to expire on December 31, 2008.

9. Defendant is the United States of America, acting by and through the Agency.

**PROCEDURAL BACKGROUND**

10. This is an action for declaratory and injunctive relief pursuant to 28 U.S.C. § 1491 and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.

11. At issue is the Agency's decision to issue the Solicitations and proceed with this Procurement despite material taint to the integrity of the Procurement and irreparable harm caused to AO by the Agency's improper disclosure of AO proprietary information.

[redacted]

**AO's Protests Before The Government Accountability Office**

12. AO has filed three protests before the Government Accountability Office ("GAO") in relation to the Procurement. These protests have been designated B-310930.1, B-310930.2, and B-310930.3.

13. On December 10, 2007, AO, by and through its counsel, filed with GAO the protest designated B-310930.1. The protest alleged that it was inappropriate for the Agency to proceed with the Procurement given the taint to the Procurement and harm to AO's competitive position resulting from the Agency's improper disclosures of AO's proprietary information. (Exhibit 1 of Appendix A hereto).[1]

14. On January 22, 2008, GAO dismissed protest B-310930.1 as premature, on the basis that it was filed in objection to the provisions of draft, rather than final, Solicitations. (Exhibit 4 of Appendix A hereto).

15. On February 23, 2008, the Agency issued the final Solicitations in the Procurement. On March 3, 2008, AO, by and through its undersigned counsel, filed with GAO the protest designated B-310930.2. Protest B-310930.2 incorporated the substance of protest B-310930.1 and discussed events that had occurred since the filing of the first protest. (Appendix A at A-0003-0052).

16. On March 21, 2008, AO, by and through its undersigned counsel, filed with GAO additional grounds of protest designated B-310930.3, and withdrew a basis of protest it had

---

1 Appendix A contains Protected Material under the GAO Protective Order issued in the GAO protests. An agreed redacted public version of these materials is included at Appendix M.

[redacted]

included in B-310930.2 that addressed the Agency's release of AO environmental information. (Appendix B at B-0002-0020).[2]

17. On March 24 and 25, 2008, GAO held teleconferences with the parties to discuss whether GAO had jurisdiction over protests B-310930.2 and .3, and whether GAO should dismiss the protests under Rule 21.11(b) of its bid protest rules. See 4 C.F.R. § 21.11(b) ("GAO will dismiss any case where the matter involved is the subject of litigation before, or has been decided on the merits by, a court of competent jurisdiction…."). Specifically, GAO queried whether protest B-310930.3, and possibly the .2 Protest, involved the subject matter of AO's Contract Disputes Act ("CDA") claim disputing ownership of the Line 3A equipment, currently pending before this Court (Case No. 07-867C). GAO requested that the parties submit briefs addressing whether or not GAO should dismiss AO's protests under GAO Rule 21.11(b) on the basis that they dealt with the matter presently in litigation before this Court.

18. Also on March 24, 2008, the Agency produced to the GAO and parties an advance portion of its Agency Report. These documents were contained in a three-ring binder titled "Investigation into Possible Violation of the Procurement Integrity Act-RFP W52P1J06-R-0201 21 March 2008" that was designated by the Agency as Protected Material. (Appendix C hereto).[3] These are the only documents the Agency had produced in the Protests at the time the GAO suspended further filings to allow its consideration of the jurisdictional issue.

---

2 Appendix B does not contain Protected Material under GAO Protective Order issued in the GAO protests.

3 Appendix C contains Protected Material under GAO Protective Order issued in the GAO protests. The parties have not yet discussed any possible redactions to this Appendix.

[redacted]

19. On April 1, 2008, pursuant to Appendix C of the CFC Rules, AO provided this Court and all other required parties advance notice of its intent to file this bid protest. AO also provided notice to GAO and the parties in protests B-310930.2 and B-310930.3 that AO did not intend to submit a brief to GAO regarding the jurisdictional issue. AO stated that it intended to file this protest with the Court and requested GAO authorization to use Protected Material in filing and pursuing this action.

20. In response, on April 1, 2008, GAO suspended the briefing schedule for the GAO jurisdictional issue and modified the GAO Protective Order to permit counsel for AO to use Protected Material in filing and pursuing this action.

21. GAO has not rendered a decision in protest B-310930.2 or B-310930.3.

## COUNT I
## FACTUAL ALLEGATIONS

22. AO, as the incumbent contractor, has operated and maintained IAAAP and MLAAP since October of 1998 under a no-cost facility use contract, set to expire on December 31, 1998. Under AO's current no-cost facility use contract, AO includes its O&M (operation and maintenance) costs for IAAAP and MLAAP in the prices of the products and services AO sells, including the products and services involved in the Procurement.

23. In August 2007, the Army issued a draft Solicitation for the Facilities Contract at IAAAP and MLAAP to be awarded in conjunction with the Production Contract and the Services BOA.

[redacted]

24. Both the draft and final Solicitations for the Facilities Contract contained six fundamental requirements in the Statements of Objectives/Statements of Work ("SOOs/SOWs") for the O&M efforts required in the Procurement as discussed below:

> The terms 'Operate and Maintain/Operations and Maintenance' (O&M), when used in the context of the Iowa/Milan acquisition, refer to those activities associated with performing the following efforts at Iowa/Milan Army Ammunition Plants: ***Security/Force Protection, Fire Protection, Maintenance, Property management & accountability, Safety and Environmental*** (see Section C Statement of Objectives (SOO)). These are the efforts the contractor performs at no-cost in exchange for use of the facilities; the costs of these efforts are borne by product and other related services performed at the facilities in accordance with the contractor's Cost Accounting Disclosure Statement.

See Solicitation, Exhibit 15 of Appendix B, at B-0024, ¶ 21 (emphasis added).[4] The six SOOs required by the Agency in the Procurement are essentially the same work AO has addressed in detail as part of its proprietary plans under which AO currently operates and maintains the IAAAP and MLAAP, with only minor changes.

25. On December 3, 2007, AO representatives learned that the Agency had disclosed extremely sensitive proprietary information belonging to AO on a sheet contained in an Excel spreadsheet file titled "MLAAP Idle Facilities-ACO 10 17 2007.xls" (the "File"). The Agency had uploaded the File to its Virtual Technical Library ("VTL") for the Procurement, which was made available to potential offerors and their teammates. (Appendix A at A-0127).

26. While the information was contained on a single sheet of the Excel spreadsheet file, it reflected detailed information [redacted]

4 This citation is to the current Solicitation.

[redacted]

[redacted] The information includes highly proprietary and sensitive cost and pricing data regarding both historical and projected data as to how AO has run, and expects to run, the IAAAP facility. (Appendix A at A-0118-0132 (*see* A-0121-0122 ¶¶ 17-20)).

27. For reasons still unexplained to AO, [redacted] had been recast by Agency personnel to extract and project important and useful information necessary to understand critical aspects of AO's operations – in other words, highly sensitive information regarding AO's operations. [redacted] (Appendix A at A-0127).

28. The data shown was reflected in dollars (as cost data), but it provided a virtual roadmap of AO's current operations, overhead charges, facilities usage, idle and underutilized facilities, and the allocation of overhead and facilities usage. The data in the File is organized into the ***precise Six fundamental requirements set out in the Statement of Objectives/Statement of Work: Security, Fire, Maintenance, Property Management, Safety, Environmental***. (See ¶ 29 above and Appendix A at A-0127).

29. The single most important evaluation criterion listed in the Solicitation issued on February 23, 2008 is called "Optimization." As the term would indicate, the concept calls for offerors to submit proposals that will optimize the usage of the space and facilities in the plants. The plants contain presently idle or underutilized space and equipment.

[redacted]

30. The O&M Contract to be awarded will be a no-cost contract. The other two contracts to be awarded (Production Contract and Services Contract) simultaneously will be priced. Section L of the Solicitation requires offerors to propose an Optimization Plan. The Optimization Plan is to describe how the Offeror will structure its operations such that it achieves optimized use of the facilities (e.g., more usage by commercial or other government customers of previously idle or underutilized facilities) such that the Army will have noticeably reduced overhead and related charges under the two priced contracts that it will award simultaneously with the O&M contract.

31. [redacted] The File is analogous to a photo in this instance, in which the information reflected in the single page of the File is worth more than a thousand words to an AO competitor. Someone intimately involved with the subject Procurement (personally and substantially involved, i.e, a "Procurement Official" in Procurement Integrity Act parlance) posted AO's highly proprietary information in the VTL where numerous representatives of AO's competitors had access to the information. In addition, anyone familiar with the arms plant O&M business, especially AO's competitors, would immediately recognize that they were viewing AO's proprietary information, and the significance of the information.

32. [redacted] After being notified, the Army immediately deleted the AO proprietary data [redacted]

from the File, noting that proprietary data had been removed from the File. (Appendix A at A-0128-0129).

33. By letter of December 6, 2008, AO notified Army personnel of a possible violation of the Procurement Integrity Act, noting that the proprietary data consisted of both "contractor bid and proposal information" and "source selection information," as those terms are defined in the Procurement Integrity Act and related FAR provisions. The data appears to meet the definition of "source selection information," as well as "contractor bid and proposal information," because the data was recast and manipulated by Agency personnel from AO's [redacted][5] (Appendix A at A-0079-82).

34. On December 10, 2007, AO, by and through its counsel, filed protest B-310930.1 with GAO. (Exhibit 1 of Appendix A hereto).

35. Subsequent to protest B-310930.1 and prior to filing protest B-310930.2, counsel for the parties engaged in numerous exchanges regarding the Agency's efforts to ascertain precisely who among AO's competitors might have had actual or potential access to the File through the VTL. Some of these various exchanges are discussed in Section IV.B. of protest B-310930.2 and in Exhibits 6 through 12 and 14 thereto. (Appendix A hereto).

36. The record provided by the Agency during these exchanges, and subsequently, confirms that as many as [redacted] personnel associated with AO's competitors had access to AO's Proprietary Information. [redacted]

---

5 There is some inconsistency between the information redacted in the GAO protests and information released in the GAO protests. We merely attempted to mirror how the terms were treated in previously agreed redacted documents.

[redacted]

[redacted]

37. AO's concerns in this regard were amplified, not reduced, by a written statement offered by counsel for intervenor in the GAO protests, [redacted] on January 9, 2008. The statement appears to include careful wording that stresses that several [redacted] employees who accessed the File made "no use of any cost information" in the File. Of course, the only information in the File is "cost information." However, while expressed in terms of cost information, the figures [redacted] reveal much about AO's current and projected operations. The entries in [redacted] January 9 letter for [redacted] expressly concede that they reviewed the data in the File relative to "percentage of active vs. inactive production lines" and "the idle facility and square footage information"; in addition, the letter states that [redacted] "***because*** it contained facilities information relevant to her proposal responsibilities" (emphasis added). These statements offered [redacted] confirm that several [redacted] viewed and used, or attempted to have [redacted], AO's Proprietary Information. At the very least, these statements confirm that the referenced individuals involved with [redacted] had access to AO's highly proprietary data specifically relevant to this Procurement. (Exhibit 2 of Appendix A hereto).

[redacted]

38. Subsequent to dismissal of protest B-310930.1, but prior to providing any further information or responses regarding AO's concerns about the harm caused to the integrity of this Procurement and to AO's ability to effectively compete in this Procurement, the Agency issued the final Solicitations for the Procurement on February 23, 2008.

39. To AO's knowledge, the only attempt by the Agency to address the irreparable harm caused by its actions appears in Section K of the final Solicitation as a special provision, which provides, in relevant part, as follows:

> (KS7028)
> <u>Proprietary Information Certification</u>
> The offeror must submit the following certification with its proposal:
> [Insert offeror's name] certifies that it has not used any other contractor's proprietary information* in the preparation of its proposal, except to the extent authorized by such other contractor or to the extent authorized by any license agreements or rights that the offeror may legally hold to that proprietary information.
> [Insert Signature Block]
> *Proprietary Information includes information previously identified by the U.S. Army as proprietary and information otherwise known by an offeror to be proprietary.

(Exhibit 15 of Appendix B at B-0075).

40. The day before the Agency issued the final Solicitations on February 23, 2008, it completed its internal Report on the improper disclosure of AO proprietary information and the Procurement Integrity Allegations (Appendix C hereto). On March 24, 2008, this Report was provided to counsel for AO (as protected material) in connection with AO's GAO Protests. The Report and documents therein acknowledge that the data released on the VTL were proprietary to AO and were improperly released. The Report confirms that [redacted] had access to the data, and that several of these employees

[redacted]

accessed, downloaded or forwarded the data. The Record indicates that neither the Agency nor [redacted] took any action to remove the employees who had access to AO's proprietary information from [redacted] nor has the Army taken any action to remove or limit [redacted] participation in the competition. [redacted]

**COUNT I**

41. The Agency completed its Report on its investigation of the improper release of AO proprietary data the day before it released the Solicitations in final form on February 23, 2008. [redacted] AO had made the Agency aware prior to the improper release that it was very concerned about the potential release of AO proprietary data, given that the Army possessed a large quantity of AO's proprietary data and had announced it would be making a large amount of data available to AO's competitors on the VTL.

42. The AO proprietary data that the Agency improperly released provides valuable insights into how AO [redacted] the six fundamental requirements that are set out in the present Solicitations under which the competition is being conducted. [redacted]

[redacted] The inherent nature of operation and maintenance contracts provides AO competitors possessing this information with substantial insights into how AO [redacted]

43. The integrity of the Procurement process, and AO's competitive position, were tainted by the damaging disclosure of AO proprietary information. The Agency took no meaningful action to address the taint. The Certification the Agency included in the final Solicitation does not adequately address the taint. No offeror certification under these circumstances would be adequate to remove the taint, at least not for some time. In any case, the Certification the Agency included in the Solicitation is particularly ineffective. The Certification does not specifically reference AO data or information. The Agency stated [redacted] that the AO proprietary information it placed on the VTL was not specifically identified as AO proprietary information. The Certification requires offerors to certify only that they have not used "any other contractor's proprietary information," which it defines as "information previously identified by the U.S. Army as proprietary and information otherwise known by an offeror to be proprietary." *See* paragraph 39 above. The Agency itself asserts that it never identified the information it improperly released on the VTL as AO proprietary information, even though it knew the information to be such. The Agency created a bootstrap Certification that does not fulfill the Agency's duty to address the taint to the Procurement process prior to proceeding with the Procurement. On information and belief, the [redacted] employees who had access to AO's [redacted]



DSMDB-2443193v01

proprietary information remain on [redacted] To AO's knowledge, so do members of other competing teams.

44. The Agency's decision to proceed with the Procurement under these circumstances is arbitrary and capricious and lacks a rational basis. The Agency Report in response to AO's Procurement Integrity Act, 41 U.S.C. § 423, ("PIA") notification that its proprietary information had been improperly revealed to competitors is incomplete in certain respects; [redacted] However, the Court need not rule on whether or not an actual PIA violation occurred, or whether the Agency's release of AO's proprietary information violated the Trade Secrets Act, 18 U.S.C. § 1905. It is clear that the release was contrary to the provisions of FAR 15.503(b)(v) and all federal procurement policy regarding release of contractor proprietary data. The Agency has failed to ensure that a meaningful competition can be conducted at this time, and that AO will be able to compete on a fair and equal basis. The Agency's decision to proceed with the Procurement at this time violates the Competition in Contracting Act, 41 U.S.C. § 253 ("CICA") and applicable law and regulation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff AO requests that it be granted the following relief:

1. A declaration that the Agency's decision to proceed with the Procurement under the circumstances violates statute and regulation, is arbitrary and capricious and lacks a rational basis;

[redacted]

2. A declaration that the Agency must follow statute and regulation in conducting any competition in the future to procure the requirements at issue;

3. An injunction prohibiting the Agency from proceeding with the Procurement until sufficient time has elapsed to remove the taint to the Procurement process and damage to AO's competitive position that resulted from the Agency's improper release of AO proprietary data.

Respectfully submitted,

Dated: April 25 2008

/s/ Stuart B. Nibley
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 420-3701
Protected Fax: (202) 822-9544
Email: nibleys@dicksteinshapiro.com

Attorney of Record for Plaintiff,
American Ordnance LLC

Of Counsel:

Michael J. Askew
Telephone: (202) 420-3513
Email: askewm@dicksteinshapiro.com

Joseph R. Berger
Telephone: (202) 420-3673
Email: bergerj@dicksteinshapiro.com

DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006

[redacted]